IN THE UNITED STATES COURT
FOR THE DISTRICT OF NEW MEXICO

CITY OF ALBUQUERQUE,

        **Plaintiff,**

v.                                    **Case No. 25-CV-01072**

SEAN DUFFY, IN HIS OFFICIAL
CAPACITY AS SECRETARY OF
TRANSPORTATION; U.S. DEPARTMENT
OF TRANSPORTATION; FEDERAL HIGHWAY
ADMINISTRATION; AND SEAN MCMASTER,
IN HIS OFFICIAL CAPACITY AS
ADMINISTRATOR OF THE FEDERAL HIGHWAY
ADMINISTRATION,

        **Defendants.**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

Without rhyme or reason, President Trump's administration has begun taking a sledgehammer to Congressionally mandated funding initiatives supporting infrastructure throughout the United States. Through Executive Orders[1] and policy directives[2], the Administration has withdrawn funding for no other reason than that they no longer align with the Administration's priorities regardless of Congress's directions to the contrary. Here, that is

---

[1] Executive Order 14154, Unleashing American Energy, (January 20,2025) 90 Fed. Reg. 8353; and Executive Order 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing (January 29, 2025) 90 Fed. Reg. 8339.

[2] *See* DOT Order 2100.7, "Ensuring Reliance Upon Sound Economic Analysis in Department of Transportation Policies, Programs, and Activities." This ordered policies, programs, and activities to mandate reliance on "rigorous economic analysis and positive cost-benefit calculations to ensure that all DOT grants, loans, contracts, and DOT-supported or -assisted State contracts bolster the American economy and benefit the American people."

infrastructure that promotes environmental sustainability and climate change impacts, bicycling, and equity.

Abruptly and with no prior notice, DOT and FHWA withdrew and cancelled Plaintiff City of Albuquerque's (the "City") $11,466,938.00 FY 2022 Rebuilding American Infrastructure with Sustainability and Equity ("RAISE") Grant Program funding award for the City of Albuquerque's Rail Trail project, citing only a change in administrative "priorities." Despite the City, FHWA, and DOT not yet executing a grant agreement, this funding was lawfully awarded to this project through the merit criteria established by Congress under the Local and Regional Project Assistance Program in the Infrastructure Investment and Jobs Act (Pub. L. 117-58, November 15, 2021, "Bipartisan Infrastructure Law"). Defendants' actions exceed statutory authority, are contrary to law, and are arbitrary and capricious.

To prevent irreparable injury to the City, this Court should declare that Defendants' actions to withdraw and cancel the City's FY 2022 RAISE Grant award violates the Administrative Procedure Act ("APA"), provisions of the United States Constitution, and is an *ultra vires* agency action. The City therefore requests that this Court vacate Defendants' unlawful actions and preliminarily and permanently enjoin Defendants from, among other things, implementing or effectuating the directive in Executive Order 14154 "Unleashing American Energy" and the accompanying DOT directives to withhold the City's FY 2022 RAISE Grant award in contravention to the Bipartisan Infrastructure Law.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including federal statutes and the APA, 5 U.S.C. §§ 551 *et seq.*, and 5 U.S.C. §§ 702, 704.

2. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, the APA, 5 U.S.C. §§ 705-06, the All Writs Act, 28 U.S.C. § 1651, and the Court's inherent equitable powers.

3. An "actual controversy" exists when, "'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant' relief." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 118 (2007) (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

4. Venue is proper in the United States District of New Mexico pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are officers and agencies of the United States served in their official capacities, no real property is at issue in this case, and the City is a municipal corporation located in the State of New Mexico, where the federal grant withdrawal that is the subject of this suit occurred and where the resulting harm to the City has and will continue to occur unless enjoined.

## PARTIES

### A. Plaintiff

5. Plaintiff City of Albuquerque is a municipal corporation and charter city organized and existing under the laws of the State of New Mexico.

**B. Defendants**

6.      Defendant Sean Duffy is the Secretary of the United States Department of Transportation and that agency's highest-ranking official. He is charged with the supervision and management of all decisions and actions of that agency, and is responsible for the actions and decisions challenged in this litigation. 49 U.S.C. § 102(b). He is sued in his official capacity.

7.      Defendant United States Department of Transportation ("DOT") is an agency and executive department of the United States government. 49 U.S.C. § 102(a). DOT has responsibility for implementing the federal grant program at issue in this action, including through the Federal Highway Administration. DOT is an "agency" within the meaning of the APA. 5 U.S.C. § 701(b)(1).

8.      Defendant Federal Highway Administration ("FHWA") is an agency of the federal government within DOT. 49 U.S.C. § 104. FHWA is an "agency" within the meaning of the APA. 5 U.S.C. § 701(b)(1).

9.      Defendant Sean McMaster is the Administrator of the Federal Highway Administration within the United States Department of Transportation. As the Administrator, he is responsible for carrying out the duties and powers vested in the Secretary of Transportation for highway safety programs, research, and development related to highway design, construction and maintenance, pedestrian performance and bicycle safety, and additional duties and powers prescribed by the Secretary. 49 U.S.C. § 104(b)(1). He is sued in his official capacity.

**ALLEGATIONS**

10.      On November 15, 2021, Congress passed the Infrastructure Investment and Jobs Act (Pub. L. 117-58, November 15, 2021), known as the Bipartisan Infrastructure Act.

11.     The Bipartisan Infrastructure Act included the Local and Regional Project Assistance Program, which authorized the Secretary of Transportation to award grants for "capital investments in surface transportation infrastructure." 49 U.S.C. § 6702(b)(1).

12.     Congress instructed the Secretary of Transportation to consider, as the "primary selection criteria" for a grant, the extent to which a project:

(A) improves safety;

(B) improves environmental sustainability;

(C) improves the quality of life of rural areas or urbanized areas;

(D) increases economic competitiveness and opportunity, including increasing tourism opportunities;

(E) contributes to a state of good repair; and

(F) improves mobility and community connectivity.

49 U.S.C. § 6702(d)(3).

13.     To implement the Program, DOT created RAISE Grant Program.

14.     On January 27, 2022, DOT issued a Notice of Funding Opportunity ("NOFO") for the RAISE Grant. A true and correct copy of the NOFO is attached hereto as Exhibit A. The NOFO stated that funds would be awarded on a "competitive basis for surface transportation infrastructure projects that will have a significant local or regional impact." NOFO p. 1.

15.     The NOFO further specifies that "[t]he Department seeks to fund projects under the RAISE Program that reduce greenhouse gas emissions and are designed with specific elements to address climate change impacts. Specifically, the Department is looking to award projects that align with the President's greenhouse gas reduction goals, promote energy efficiency, support

fiscally responsible land use and transportation efficient design, increase use of lower-carbon travel modes such as transit and active transportation, incorporate electrification or zero emission vehicle infrastructure, increase climate resilience, support domestic manufacturing, incorporate lower-carbon pavement and construction materials, reduce pollution, and recycle or redevelop brownfield sites." *Id.* pp. 3-4.

16.    The NOFO also "seeks to award projects under the RAISE Program that address environmental justice, particularly for communities that disproportionally experience climate change-related consequences," and "seeks to award projects under the RAISE Program that proactively address racial equity and barriers to opportunity, including automobile dependence as a form of barrier, or redress prior inequities and barriers to opportunity." *Id.* pp. 4-5.

17.    The NOFO outlines the criteria by which a project would be selected, specifically evaluating applications based on "statutory primary selection criteria: safety, environmental sustainability, quality of life, economic competitiveness and opportunity, state of good repair, and mobility and community connectivity. Statutory additional considerations include partnership and collaboration, innovation, demonstrated project readiness, and cost effectiveness." *Id.* p. 6. This selection criteria mirrors the language contained in the enacting statute. 49 U.S.C. § 6702(d)(3).

18.    The City applied for the FY 2022 RAISE Grant in April of 2022, submitting a proposal for funding for the Albuquerque Rail Trail ("Rail Trail") project. A true and correct copy of the City's application is attached hereto as Exhibit B.

19.    The Rail Trail is a multi-use urban trail project through the heart of Downtown Albuquerque. It will connect Downtown's rail corridor by traveling through and building bridges

across the communities disconnected by the railroad built in 1880, while providing designated space for pedestrians and cyclists in multiple portions of the trail.

20.     The Rail Trail addresses the need to increase safety for pedestrians and cyclists in Albuquerque and to connect key infrastructure throughout the City, all while reducing vehicle traffic on City streets and associated environmental impacts.

21.     The City's application demonstrated that the Rail Trail project met all of the merit criteria outlined in the NOFO.

22.     In the application, the City explained that:

- Between 2015 and 2019, 59 cyclists were injured and six were killed along three parallel streets that are within 800 feet of the proposed Rail Trail. Similarly, 65 pedestrians were injured and four were killed in the same area. The Rail Trail project is projected to reduce bicycle fatalities between 52% and 88%, preventing up to 345 injuries and fatalities over the next thirty years, and creating a safer pedestrian connector through Downtown.

- Physical separation between bicyclists and cars can help prevent vehicle-involved collisions and near-collisions. By increasing the number of bike facilities, especially separated and protected bike lanes, the Rail Trail improves safety outcomes for all user types, including vehicles, buses, cyclists, and pedestrians.

- The City is the most populated metro area in the State of New Mexico, which contributes to local emissions and air pollutants. The Rail Trail will reduce vehicle miles traveled by as much as 99,259 annually by encouraging mode switches to bicycling and will reduce GHG emissions from transportation.

- The Rail Trail supports the City's 2021 Climate Action Plan,[3] which was established to reduce emissions throughout the City and strengthen local ecosystems. The City aims to increase tree canopy and green spaces in order to help absorb greenhouse gas emissions, strengthen ecosystems, and improve resiliency throughout major summer flooding events. The Rail Trail has been designed to provide this sustainable development by increasing local quantities of trees, green spaces, and vegetation with the use of native species in landscaping.

- The Rail Trail will connect neighborhoods that have been historically disconnected by the railroad and make alternative transportation faster, easier, and more accessible.

- The Rail Trail will improve and expand access to active transportation alternatives, increasing annual bicycle trips by up to 570,000 trips per year, and will provide a safe, well-lit path to accommodate all types of users, including pedestrians, cyclists, people using assisted mobility devices, children, and the elderly.

- The Rail Trail creates safe and high-quality active transportation infrastructure in an area that has higher levels of social vulnerability, including higher rates of poverty, lower median incomes, and lower rates of homeownership, and creates a 30-year travel cost savings of $1.2 million.

---

[3]*City of Albuquerque 2021 Climate Action Plan,* https://www.cabq.gov/sustainability/documents/2021-climate-action-plan.pdf (last visited Oct. 28, 2025).

- The Rail Trail will reduce transportation and housing cost burdens for existing residents, and create a live-work-play district that encourages new residents to move to locations along the Rail Trail.

- The Rail Trail will enable nearly $270 million in trail-oriented-development potential along the trail corridor, increasing opportunities for businesses to develop and thrive along the trail.

- The Rail Trail will draw residents and tourists back into Downtown Albuquerque, strengthening the vibrant entertainment and arts district, and encourage growth of the Downtown housing market.

- The Rail Trail is collaborating with the private non-profit Friends of the Albuquerque Rail Trail to provide enhanced maintenance and programming of the trail, while utilizing Plaintiff's Department of Parks and Recreation to maintain and support the trail.

- The City is engaging with diverse-owned businesses and advocates for diverse-owned businesses through a Rail Trail Equity Steering Committee that will help encourage equitable development, small business growth, and opportunities for diverse-owned business creation along the trail.

- The City is further entering a private-public partnership with Friends of the Albuquerque Rail Trail to develop events, more robust security, and more frequent cleanup of the trail.

- The City will be deploying broadband and Wi-Fi along the trail to enable Smart Cities technology like smart trashcans, or video surveillance to alert the City of real-time safety issues like crimes or trips and falls.

23. DOT issued a Notice of Award for the City's Rail Trail project on August 11, 2022, for $11,466,938.00 of the total estimated project costs of $14,333,671.00. A true and correct copy of DOT's Notice of Award is attached hereto as Exhibit C.

24. The City promptly began working with FHWA on developing a federally compliant design.

25. The City also requested the New Mexico Department of Transportation ("NMDOT") to act as a pass through for the RAISE Grant, which the NMDOT agreed to do.

26. For the next three years, the City, NMDOT, and FHWA negotiated the grant agreement pending the Rail Trail project's design being federally compliant and the project itself being "shovel ready." FHWA advised the City that it would not sign the grant agreement and obligate the funding until a project was ready to begin construction under their standards.

27. During that time, the City, NMDOT, and FHWA met monthly to review design of the Rail Trail project and compliance with FHWA and NMDOT standards. The City expended considerable resources in doing so, including dozens of consultant man-hours addressing NMDOT and FHWA comments on different levels of design.

28. On or about March 11, 2025, Secretary Duffy issued an internal directive to the Heads of Secretarial Offices and Operating Administrations ("Duffy Memo").[4] The Duffy Memo

---

[4] Internal Memorandum from Dep't of Transp. to Heads of Secretarial Offices and Operating Administrations (March 11, 2025), *available at* https://www.apta.com/wp-content/uploads/DOT-OST-MEMO-Competitive-Grant-Guidance-03-11-2025.pdf.

instructed offices to review "competitive award selections made after January 20, 2021, that do NOT have fully obligated grant agreements or cooperative agreements in place." Duffy Memo p. 1 (emphasis in original).

29. The Duffy Memo stated that the focus of the review was to "identify project scope and activities that are allocating funding to advance climate, equity, and other priorities counter to the Administration's Executive Orders." *Id.* Executive Order 14154, Unleashing American Energy, was specifically listed. *Id.*

30. Specifically, the Duffy Memo sought to "identify programs for which award selections may have included any of the following elements: equity activities, Diversity, Equity, and Inclusion (DEI) activities, climate change activities, environmental justice (EJ) activities, gender-specific activities, when the primary purpose is bicycle infrastructure (i.e., recreational trails and shared-use paths, etc.), electric vehicles (EV), and EV charging infrastructure." *Id*. p. 2.

31. It further required "project-by-project" review of any "project scope elements for potential removal" if the project met the following criteria: "[s]tatutory language includes equity requirements, climate considerations, or bicycle infrastructure; NOFO mandatory evaluation criteria includes equity and/or climate requirements; [or] [e]ligible activities included bicycle infrastructure, EV and/or EV charging infrastructure." *Id.*

32. Following this project-by-project review, the Duffy Memo instructs DOT and FHWA leadership to decide if projects could continue in their current form, be revised with a reduced or modified scope, or be canceled entirely. *Id.* pp. 2–3.

33.     The City and NMDOT sent back revisions to the grant agreement in August of 2025, anticipating that the Rail Trail's design was nearing approval and the project was almost shovel ready—meaning the agreement would be finalized shortly thereafter.

34.     On September 9, 2025, Maria Lefevre, the Executive Director of the Office of the DOT's Under Secretary, sent the City a letter claiming that DOT had reviewed the City's FY 2022 RAISE Grant for the Rail Trail project "in light of DOT's priorities" and was now withdrawing selection of the grant (the "DOT Letter"). A true and correct copy of the DOT Letter is attached hereto as Exhibit D.

35.     According to the DOT Letter, DOT's priorities "presently" include: "focusing DOT's multimodal grant programs primarily on projects that promote vehicular travel; and ensuring that taxpayer dollars are used efficiently in ways that maximally benefit the American people and improve their quality of life."

36.     The sole basis for withdrawal cited in the DOT Letter was DOT's determination "that [the City's] project is inconsistent with the above priorities," ran "counter to DOT's priority of focusing DOT's multimodal grant programs primarily on projects that promote vehicular travel," and "no longer aligns with DOT priorities."

37.     The DOT Letter did not provide any details of the individualized review DOT had apparently conducted, did not offer support for why the Rail Trail project was inconsistent with DOT's current "priorities," did not cite the Bipartisan Infrastructure Act or the criteria set forth in 49 U.S.C. § 6702(d)(3), and did not explain why the Rail Trail project did not "benefit the American people and improve their quality of life." The DOT Letter did not even offer any remedy or process to appeal DOT's summary withdrawal.

38.     Defendants' withdrawal and cancellation of the City's FY 2022 RAISE Grant award harmed the City by eliminating approximately 80% of the necessary funding—funding that the City had been counting on receiving for three years—for critical multimodal infrastructure that would enhance pedestrian and cyclist safety.

39.     Over the many months of negotiations and collaboration with the FHWA, during which FHWA gave all indications that the FY 2022 RAISE Grant award was proceeding, the City came to rely on this funding source and expended considerable resources in making the Rail Trail project federally compliant in accordance with FHWA's directives. Indeed, until the DOT Letter, the City had no notice whatsoever that the FY 2022 RAISE Grant award might be withdrawn.

40.     Defendants' withdrawal and cancellation of the City's FY 2022 RAISE Grant award concluded the agency's decision-making process and has direct and appreciable legal consequences, constituting a final agency action.

41.     In withdrawing the City's award, Defendants acted arbitrarily, capriciously, and contrary to law, including by revising through Executive fiat the statutory eligibility standards for the RAISE Grant to exclude programs precisely because they meet the criteria in 49 U.S.C. § 6702(d)(3), such as equity requirements, climate considerations, or bicycle infrastructure.

42.     Defendants exceeded their statutory authority when they withdrew the City's award based on revised eligibility standards for the RAISE Grant to exclude programs with statutory language that includes equity requirements, climate considerations, or bicycle infrastructure.

43.     Defendants' decision to withdraw the City's award due to revised eligibility standards for the RAISE Grant was contrary to the intent of Congress, which directed the Secretary

to fund projects that improve environmental sustainability and consider "modal diversity" in doing so.

44.  An actual controversy exists in this matter; Defendants' cancellation and withdrawal of Plaintiff's FY 2022 RAISE Grant award was unlawful and should be set aside.

## CAUSES OF ACTION

### COUNT I – Violation of Administrative Procedure Act, 5 U.S.C. § 706 (2)(A)(C)

### In Excess of Statutory Authority and Contrary to Law

45.  The City realleges all paragraphs above as if fully set forth herein.

46.  Defendants DOT and FHWA are "agencies" as defined in 5 U.S.C. § 551(1).

47.  "Final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

48.  Defendants' withdrawal and cancellation of the City's FY 2022 RAISE Grant award constitutes the final agency action because it represents the "consummation" of the agency's decision-making process and an action "from which legal consequences will flow." *Bennett v. Spear,* 520 U.S. 154, 178 (1997) (citation and quotation marks omitted).

49.  The APA authorizes this Court to hold unlawful and set aside final agency action that is "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A),(C).

50.  An act "not in accordance with law," means "*any* law, and not merely those laws that the agency itself is charged with administering." *FCC v. NextWave Personal Commc'ns*, 537 U.S. 293, 300 (2003) (emphasis in original).

14

51.    "[A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261 (D.C. Cir. 2013); *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231–35 (9th Cir. 2018).

52.    Similarly, an agency is powerless to amend or repeal statutes or to supplant Congress's spending directives with its own. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *see also Washington v. U.S. Dep't of Transp.*, --- F. Supp. 3d. ----, 2025 WL 1742893, at *19-20 (W.D. Wash. June 24, 2025) (enjoining DOT from refusing to disburse funds in accordance with Congressional directives). "Any action that an agency takes outside the bounds of its statutory authority is ultra vires and violates the [APA]." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (citation modified).

53.    Neither the Bipartisan Infrastructure Act nor any other federal statute or regulation authorizes Defendants to withdraw or cancel FY 2022 RAISE Grant awards. Those awards are based exclusively on the underlying statutory criteria that established the grant program in the first place. 49 U.S.C. § 6702. *New York v. Trump*, 764 F. Supp. 3d 46, 50 (D. R.I. 2025) (reasoning that when Congress instructs the Executive to provide funding "based on stated statutory factors," the Executive cannot withhold those funds based on any other criteria).

54.    Defendants have violated their governing statutes by withdrawing a grant already awarded under the specific statutory requirements set by Congress; in fact, Defendants withdrew the grant precisely because it satisfied the criteria set forth in 49 U.S.C. § 6702. But "[a]gencies have only those powers given to them by Congress, and enabling legislation is generally not an

open book to which the agency may add pages and change the plot line." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (citation modified); *Urban Sustainability Directors Network v. U.S. Dep't of Agric.*, 2025 WL 2374528, at \*32-33 (D. D.C. 2025) (enjoining grant termination because the "grant was . . . terminated for addressing the[] very issues Congress intended for such programs to address").

55. By refusing to spend money that Congress appropriated, Defendants' actions also constitute the unlawful impoundment of appropriated funds in violation of the Impoundment Control Act of 1974 ("ICA"). *See* 2 U.S.C. § 682 *et seq.*

56. Under the ICA, a "deferral" includes any "withholding or delaying the obligation or expenditure of" appropriated funds, as well as "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of" appropriated funds. *Id.* § 682(1). When the Executive wishes to defer funds, it must "transmit to the House of Representatives and the Senate a special message" explaining, among other things, the amount of funds being deferred, the length of time of the deferral, and the reasons (including pertinent legal authority) that justify the proposed deferral. *Id.* § 684(a). That did not occur here.

57. There are only three permissible grounds for deferrals, *id.* § 684(b), none of which includes efforts to ensure funds are spent consistent with the President's new policy priorities.

58. Defendants' actions constitute an impermissible "deferral" because they effectively "preclude[] the obligation or expenditure of" funds that Congress appropriated. *See also City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (reasoning that the Executive lacks authority to engage in policy-based deferrals that "negate the will of Congress").

16

59.     Aside from deferrals, the ICA's only other exception to the Executive's obligation to make appropriated funds available for obligation is a "rescission," which requires Congressional approval. That did not occur here either.

60.     The City is an aggrieved person suffering a legal wrong or adversely affected by Defendants' conduct under 5 U.S.C. § 702 and is entitled to declaratory and injunctive relief pursuant to 28 U.S.C. § 2201.

## COUNT II – Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious

61.     The City realleges all paragraphs above as if fully set forth herein.

62.     Defendants DOT and FHWA are "agencies" as defined in 5 U.S.C. § 551(1).

63.     A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

64.     Defendants' withdrawal and cancellation of the City's FY 2022 RAISE Grant was arbitrary and capricious in violation of the APA.

65.     Government agencies and officers act in an arbitrary and capricious manner if they fail to engage in "reasoned decision-making." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (citation omitted). The "well-worn arbitrary-and-capricious standard ensures that an administrative agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 567 (2025) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

66.     Agency action is arbitrary and capricious when the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm Mut. Automobile Ins. Co.*, 463 U.S. at 43; *see also Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852, at *11 (D. D.C. Feb. 3, 2025) ("[F]urthering the President's wishes" is not a substitute for the requisite "rational connection between the facts, the agency's rationale, and the ultimate decision.").

67.     In particular, when an agency departs from a prior decision or "has engendered serious reliance interests," the agency's failure to consider such factors "would be arbitrary or capricious." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). In short, the agency must "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *Id.* (emphasis added); *see also Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020) (in changing positions, agencies must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns.").

68.     Without such a reasoned explanation, agencies could offer ingenuine justifications for important decisions that could not be scrutinized by courts or the public. *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019); *Washington*, 2025 WL 1742893, at *22–23 (enjoining DOT from refusing to disburse funds because it failed to "consider[] relevant factors" and relied on the boilerplate statement that a program "does not align with current U.S. DOT policy and priorities" (citation modified)).

18

69.     An abrupt, permanent withdrawal of millions of dollars of previously awarded federal funding is a paradigmatic example of arbitrary and capricious agency action. *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 470 (D. R.I. 2025) (collecting cases).

70.     Defendants' withdrawal of a grant previously awarded to Plaintiff was arbitrary and capricious for many reasons, including (but not limited to) the following:

a.  The grant withdrawal conflicted with prior agency decisions to award the grants while providing no explanation for the change in agency position. The City received this grant award after a rigorous, objective, and competitive application and review process that necessarily established that its funded project was meritorious and satisfied relevant criteria. DOT did not explain why it was departing from its prior decision, which was consistent with Congressional funding mandates.

b.  The grant withdrawal failed to explain how the Rail Trail project failed to further DOT's current "priorities," such as "focusing DOT's multimodal grant programs primarily on projects that promote vehicular travel" and "ensuring that taxpayer dollars are used efficiently in ways that maximally benefit the American people and improve their quality of life."

c.  The grant withdrawal failed to reference any of the criteria set forth in 49 U.S.C. § 6702 or explain how the withdrawal was consistent with those criteria.

d.  The grant withdrawal failed to consider any of the serious reliance interests engendered by the prior approval of the City's FY 2022 Raise Grant award,

19

including the administrative, economic, and infrastructure arrangements that the City had made based on the prior award.

e.  The grant withdrawal was based on a desire to appease the Administration's current wishes and not based on any Congressional policy directives such as those enshrined in the Bipartisan Infrasturcture Law, which remains on the books to this day.

f.  Defendants failed to consider obvious, reasonable, and lawful alternatives to their actions, such as complying with the requirements of the Bipartisan Infrastructure Law and honoring their prior approval of the City's FY 2022 RAISE Grant award. Defendants never reached out to the City to negotiate a reduced award as even the Duffy Memo contemplated. They did not even offer the City any appeal rights or other remedy.

71.  The general, boilerplate statements in the DOT letter are emblematic of an agency that "did *not* engage in . . . a reasoned process." *Urban Sustainability Directors Network*, 2025 WL 2374528, at *36 (emphasis in original); *State of New York v. Noem*, 2025 WL 293911, at *8–10 (S.D.N.Y. Oct. 16, 2025).

72.  Ultimately, Defendants' withdrawal and cancellation of the grant award represents the consummation of their decision-making and is therefore a final agency action justiciable under the APA.

73.  Accordingly, Defendants' actions to withdraw and cancel the City's FY 2022 RAISE Grant award must be set aside as arbitrary, capricious, and not in accordance with law.

74.    The City is an aggrieved person suffering a legal wrong or adversely affected by Defendants' conduct under 5 U.S.C. § 702 and is entitled to declaratory and injunctive relief pursuant to 28 U.S.C. § 2201.

## COUNT III – Violation of Separation of Powers

75.    The City realleges all paragraphs above as if fully set forth herein.

76.    Article I, Section 1 of the U.S. Constitution states: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. Art. I, § 1. "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting Federalist No. 70, at 475 (A. Hamilton)). When the Executive Branch attempts to exercise legislative power, it perverts the deliberately created balance the Framers sought.

77.    Only Congress has the Constitutional right to appropriate funds. U.S. Const. Art. I, § 9, cl. 7; *see also Train v. City of New York*, 420 U.S. 35, 45–47 (1975). An Executive Agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

78.    "[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021).

79.    The President or his Executive Agencies have no constitutional power to withdraw or cancel funds appropriated by Congress, which is especially true when such actions are based on

21

Presidential policies rather than Congressional spending directives. *See City & County of San Francisco,* 897 F.3d at 1231–35.

80.     Congress enacted the Bipartisan Infrastructure Act, which includes the Local and Regional Project Assistance Program, to award grants for "capital investments in surface transportation infrastructure." 49 U.S.C. § 6702(b)(1).

81.     Defendants DOT and FHWA decided to withdraw and cancel the City's FY 2022 RAISE Grant funding because the City's "project is inconsistent" with and "no longer aligns with DOT priorities."

82.     In other words, Defendants DOT and FHWA are withdrawing and cancelling the City's FY 2022 RAISE Grant because the City's Rail Trail project both satisfied the criteria set forth in 49 U.S.C. § 6702 and was awarded pursuant to it. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–91 (1949); *Dugan v. Rank*, 372 U.S. 609, 621–22 (1963).

83.     Defendants DOT and FHWA's actions violate the separation of powers doctrine because the basis for withdrawing and cancelling the funding award directly contravenes their statutory mandates.

84.     Therefore, the City is an aggrieved person suffering a legal wrong as a result of Defendants' conduct and is entitled to have these actions be set aside through declaratory and injunctive relief pursuant to 28 U.S.C. § 2201.

### COUNT IV – Violation of the Take Care Clause

85.     The City realleges all paragraphs above as if fully set forth herein.

86.     The Constitution provides that the Executive Branch must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *see Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327

22

(2014) ("Under our system of government, Congress makes laws and the President . . . faithfully executes them." (quotation modified)).

87.    "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton*, 524 U.S. at 438.

88.    The Executive Branch violates the Take Care Clause when it declines to execute or overrides a statute or the legislative intent of Congress. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Circ. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting the argument that by charging the President with the faithful execution of laws, the Take Care Clause "implies a power to forbid their execution"); *see also Util. Air Reg. Grp.*, 573 U.S. at 327 (noting that the President "act[s] at time through agencies").

89.    Defendants DOT and FHWA violated the Take Care Clause by withdrawing and cancelling the City's FY 2022 RAISE Grant because its Rail Trail project both satisfied and was awarded pursuant to Congressional legislation as set forth in 49 U.S.C. § 6702.

90.    Defendants DOT and FHWA's actions overrode Congress's considered judgments.

91.    Accordingly, the City is an aggrieved person suffering a legal wrong as a result of Defendants' conduct and is entitled to have these actions be set aside through declaratory and injunctive relief pursuant to 28 U.S.C. § 2201.

### COUNT V – Violation of the Presentment Clauses

92.    The City realleges all paragraphs above as if fully set forth herein.

93.    The Presentment Clauses limit the President's role in lawmaking to vetoing an "entire bill" "*before* the bill becomes law." *Clinton*, 524 U.S. at 439 (emphasis in original).

23

"Presidential action that either repeals or amends parts of duly enacted statutes" violates the Presentment Clauses. *Id.*

94. Defendants DOT and FHWA's withdrawal and cancellation of the City's FY 2022 RAISE Grant award, which was made consistent with and pursuant to 49 U.S.C. § 6702, violates the Presentment Clauses because the agencies seek to repeal parts of the Bipartisan Infrastructure Act after it was passed by Congress and signed by the President.

95. The basis for Defendants DOT and FHWA's withdrawal and cancellation is the same reason why the City was awarded the FY 2022 RAISE Grant award.

96. The Presentment Clauses prohibit the President and the Executive Branches from amending the spending provisions of the Bipartisan Infrastructure Act and failing to fulfill them based on presidential policies that are wholly different than Congress's directives for the funds and the program. *See Util. Air Reg. Grp.*, 573 U.S. at 327. Again, Defendants DOT and FHWA are withdrawing and cancelling a grant already awarded under the specific statutory requirements set by Congress precisely because City's Rail Trail project satisfied the criteria set forth in 49 U.S.C. § 6702. *See Larson*, 337 U.S. at 689–91; *Dugan*, 372 U.S. at 621–22.

97. By usurping Congress' spending directives and replacing them with the President's policy preferences, Defendants DOT and FHWA have violated the Presentment Clauses. *See* U.S. Const. Art. I, § 7, cl. 2–3.

98. Consequently, the City is an aggrieved person suffering a legal wrong as a result of Defendants' conduct and is entitled to have these actions be set aside through declaratory and injunctive relief pursuant to 28 U.S.C. § 2201.

## COUNT VI – *Ultra Vires* Agency Action

99.    The City realleges all paragraphs above as if fully set forth herein.

100.    An Executive Agency may exercise only that authority which is conferred by statute. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (federal agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is *ultra vires*").

101.    Congress never directed Defendants DOT and FHWA to withdrawal and cancel funding awards appropriately prescribed pursuant to 49 U.S.C. § 6702.

102.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). In other words, the U.S. Supreme Court has permitted equitable relief against federal officials who act "beyond th[e] limitations" required by federal statute. *Larson*, 337 U.S. at 689.

103.    Defendants are acting *ultra vires* by withdrawing and cancelling a grant already awarded under the specific statutory requirements set by Congress because the City's Rail Trail project satisfied the criteria set forth in 49 U.S.C. § 6702. *See Larson*, 337 U.S. at 689–91; *Dugan*, 372 U.S. at 621–22.

104.    Defendants DOT and FHWA have no statutory authority to withdraw and cancel the City's FY 2022 RAISE Grant award for reasons wholly inconsistent with 49 U.S.C. § 6702.

105.    Thus, Defendants DOT and FHWA's withdrawal and cancellation of the City's FY 2022 RAISE Grant award are unlawful *ultra vires* agency actions.

106. Accordingly, the City is an aggrieved person suffering a legal wrong as a result of Defendants' conduct and is entitled to have these actions be set aside through declaratory and injunctive relief pursuant to 28 U.S.C. § 2201.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

a. Declare Defendants' actions to withdraw or cancel Plaintiff's FY 2022 RAISE Grant funding award unlawful.

b. Vacate Defendants' actions to withdraw or cancel Plaintiff's FY 2022 RAISE Grant funding award.

c. Enjoin Defendants from implementing or effectuating through any action the directives in the Executive Order and accompanying DOT directives, including the Duffy Memo, to withhold or cancel FY 2022 RAISE Grant funding award in contravention of the express congressional mandates in the Bipartisan Infrastructure Law.

d. Retain jurisdiction to ensure compliance with the orders of this Court.

e. Award Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412.

f. Grant other such relief as this Court may deem proper.

Respectfully submitted,

Dated: 10/31/2025

By: /s/ Lauren Keefe

Lauren Keefe, City Attorney
Devon P. King, Deputy City Attorney
**Office of the City Attorney, City of Albuquerque**
One Civic Plaza NW
PO Box 2248
Albuquerque, NM 87103
Telephone: 505-768-4500
lkeefe@cabq.gov
dking@cabq.gov


Ryan J. Regula*
Ryan P. Hogan*
Charlene A. Warner*
**Snell & Wilmer, LLP**
1 E. Washington St., Ste. 2700
Phoenix, AZ 85004-2556
Telephone: 602-382-6000
rregula@swlaw.com
rhogan@swlaw.com
cwarner@swlaw.com
*Pro Hac Vice Forthcoming*

Attorneys for Plaintiff City of Albuquerque